# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| **DEANA TIPLER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **8:04CV470** |
| | ) | |
| **vs.** | ) | **ORDER** |
| | ) | |
| **DOUGLAS COUNTY, NEBRASKA and** | ) | |
| **ROBERT HOUSTON,** | ) | |
| **Director of Douglas County Corrections,** | ) | |
| | ) | |
| **Defendants.** | ) | |

This matter is before the court on the defendants' Motion for Summary Judgment (Filing No. 40).[1]  The defendants filed a brief (Filing No. 41), an index of evidence (Filing No. 42) and a reply brief (Filing No. 52) in support of the motion.  The plaintiff filed a brief (Filing No. 48) and an index of evidence (Filing No. 49) in opposition to the motion.

## INTRODUCTION

This case arises from the employment relationship between the plaintiff and the defendants.  The following facts are alleged in the plaintiff's amended complaint.  **See** Filing No. 28.  The plaintiff is an African-American female.  At all relevant times, the plaintiff was employed by Douglas County as a correctional officer at the Douglas County Correctional Center.  The plaintiff commenced her duties as a Correctional Officer I on September 9, 2002, and was subsequently assigned to the "B" shift, which runs from 7:00 a.m. until 3:00 p.m.  On May 30, 2003, the plaintiff was told, that effective July 6, 2003, she would be transferred to the "A" shift, which runs from 11:00 p.m. until 7:00 a.m.  The reason for the change was because there were not enough female corrections officers on the "A" shift for adequate guarding of female inmates.  At that time, the plaintiff had seniority over a number of male correctional officers who were allowed to remain on the "B" shift. The plaintiff states the terms of the Fraternal Order of Police (FOP) Contract with Douglas County would allow

---

[1]The undersigned magistrate judge exercises jurisdiction over this matter after consent by the parties pursuant to 28 U.S.C. § 636(c)(1).  **See** Filing No. 11.

the plaintiff to exercise her seniority rights to retain her preferred shift over a less senior male correctional officer.

On October 27, 2003, the plaintiff filed charges of discrimination against the defendants through the Nebraska Equal Opportunity Commission (NEOC). In July 2004, the Equal Employment Opportunity Commission (EEOC) adopted the NEOC's findings and issued the plaintiff a right to sue letter. On September 24, 2004, the plaintiff filed the instant action alleging the defendants discriminated against her on the basis of her gender when they denied her the choice of shift and/or the opportunity to exercise her seniority rights in violation of her civil rights under 42 U.S.C. § 1983 (Claim I); Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e-2(a) (Claims II and III); and the Nebraska Fair Employment Act (NFEA), Neb. Rev. Stat. § 48-1102(2) (Claim IV). On May 10, 2005, the court dismissed the plaintiff's claim under the NFEA and for punitive damages. **See** Filing No. 25. On May 20, 2005, the plaintiff filed an amended complaint in accordance with the court's order. **See** Filing No. 28. Based on her claims, the plaintiff seeks compensatory damages, attorney's fees and injunctive relief.

The defendants move for summary judgment on all of the plaintiff's claims. The defendants argue the plaintiff cannot establish, as a matter of law, that she was deprived of her right to equal protection when she was denied a shift assignment. Additionally, the defendants contend the plaintiff cannot prove she was discriminated against because of her gender. Specifically, the defendants claim the plaintiff did not suffer a tangible adverse employment action and the reassignment of the plaintiff to the A shift was a based upon a bona fide occupational qualification (BFOQ). The plaintiff opposes the defendants' motion and asserts there exist material facts in dispute; she suffered an adverse employment action and that gender is not a BFOQ for the job assignment.

## UNCONTROVERTED FACTS

The plaintiff has been employed as a correctional officer by the Douglas County Department of Corrections since September 9, 2002. **See** Filing No. 28, Amended Complaint, ¶ 7 and 8. The defendant, County of Douglas, Nebraska, is a political subdivision of the State of Nebraska. **See** Filing No. 42, Exhibit 2 - Houston Aff. ¶ 4. The

2

Douglas County Department of Corrections is an agency of Douglas County, Nebraska. **See** Filing No. 28, Amended Complaint, ¶ 3.  The Department of Corrections is responsible for the care, lodging, safekeeping and security of both male and female inmates.  **See** Filing No. 42, Exhibit 2 - Houston Aff. ¶ 5.  The male and female inmates are kept in separate housing units.  ***Id.***

The defendant, Robert Houston, sued in his official capacity, was appointed as Interim Director of the Douglas County Department of Corrections in April of 2003.  **See** Filing No. 42, Exhibit 2 - Houston Aff. ¶ 3.  In September of 2003, the Douglas County Board hired Mr. Houston as Director of the Department of Corrections.  ***Id.***  Mr. Houston continued as Director until February of 2005.  ***Id.***

The Nebraska Commission on Law Enforcement and Criminal Justice (Crime Commission), is an agency of the State of Nebraska.  **See** Filing No. 42, Exhibit 1 - Macomber Aff. ¶ 3.  The Crime Commission is responsible for a variety of criminal justice programs and functions mandated by state and federal law.  ***Id.***  One of its functions is the establishment of the Nebraska Jail Standards Board, pursuant to Nebraska Revised Statute §§ 83-4,124 to 83-4,134.  ***Id.***  The Jail Standards Board is responsible for adopting and enforcing minimum standards for the operation, maintenance and construction of adult and juvenile jail facilities that are operated by political subdivisions in Nebraska.  **See** Filing No. 42, Exhibit 1 - Macomber Aff. ¶ 4 and 6; NEB. REV. STAT. § 83-4,124.  To this end, the Jail Standards Board has adopted and published the "Nebraska Minimum Jail Standards for Adult Jail Facilities, Title 81 Regulations" (Jail Standards).  ***Id.*** Macomber Aff. ¶ 4.  Nebraska Revised Statute § 47-111 impacts the Jail Standards Board's regulations.

Nebraska Revised Statute § 47-111 provides:

> <u>In every county where there is a female prisoner, twenty-four hour supervision shall be provided by a matron appointed by the county board, whose duty it shall be to have entire charge of the female prisoners</u>, and the board may also in its discretion appoint such matron when there is a sick prisoner or one that is a minor under the age of sixteen.  Such matrons shall be under the direction of the sheriff, shall take the necessary oath before entering upon the duties of the office, and shall be paid by the board from the county treasury only for the time actually engaged; *Provided*, that in counties having a

3

> population in excess of two hundred thousand inhabitants, a
> deputy or correctional officer shall be hired by the sheriff whose
> duty it shall be to have charge of the female prisoners and
> perform those functions required of a deputy related to such
> duty, at a salary of not less than five hundred dollars per
> month, which salary shall be drawn out of the county treasury.
> Such matron, deputy or correctional officer shall, when
> required, report to the board or district judges.

NEB. REV. STAT. § 47-111 (Reissue 1998) (emphasis added).

During all times relevant, the Jail Standards Board has interpreted Nebraska Revised Statute § 47-111, as requiring female-only supervision of female inmates in county correctional facilities. **See** Filing No. 42, Exhibit 1 - Macomber Aff. ¶ 10. The Jail Standards specifically address female supervision of female inmates. The relevant provisions, which were and still are in effect, are in Title 81, Chapter 2, and provide:

> 004.02A  Female employees shall provide around-the-clock
> supervision of all female inmates housed in a jail facility.

> 004.02B The facility administrator shall insure that inmates are
> viewed personally by facility employees often enough to
> maintain their safekeeping, but in no event less than one time
> per hour and document it.

**See** Filing No. 42, Exhibit 4 - 81 NAC 2 §§ 004.02A-B; Exhibit 1 - Macomber Aff. ¶ 7.

During all times relevant, the terms and conditions of the plaintiff's employment were covered by the provisions of a collective bargaining agreement between Douglas County and the FOP, Lodge No. 8, (July 1, 2001 to June 30, 2003), executed on June 18, 2002 and effective until August 17, 2004 (Union Contract). **See** Filing No. 42, Exhibit 3 - Lee Aff. ¶ 4. Article IX of the Union Contract sets forth the policies and procedures for assigning shifts. *Id.* Exhibit 3 - Lee Aff. ¶ 5; Exhibit 8. Pursuant to the Union Contract, a shift bid is held twice a year, effective in January and July for six months. *Id.* Exhibit 3 - Lee Aff. ¶ 6. There are three shifts: A shift (11:00 p.m. to 7:00 a.m.), B shift (7:00 a.m. to 3:00 p.m.) and C shift (3:00 p.m. to 11:00 p.m.). *Id.* For each shift bid the employees submit a form stating their first and second choice in shift. *Id.* ¶ 7. Pursuant to Article IX, Section 2A, of the Union Contract,

> All shift bidding and days off bidding will be controlled by classification seniority except where Nebraska State Law and Nebraska Jail Standards dictate the staffing of female officers.

**See** Filing No. 42, Exhibit 8.  Therefore, shift assignments are generally controlled by seniority, however, the Department of Corrections adjusts shift assignments where required by law for the staffing of female officers.  **See *id.*** Exhibit 3 - Lee Aff. ¶ 8.

The Union Contract provides for a minimum staffing requirement of female officers for each shift.  ***Id.*** Exhibit 8, Art. IX, Sec. 2.  The Union Contract also grants the Department of Corrections the right to adjust shift schedules if the minimum number of female officers needed for each shift was not obtained through the shift bid process.  ***Id.***; **see also *Id.*** at Exhibit 3 - Lee Aff. ¶ 10.  Pursuant to the Union Contract, adjustments are made based on "inverse seniority."  ***Id.*** Exhibit 8; Exhibit 3 - Lee Aff. ¶ 10.

In July of 2003, the plaintiff was a Correctional Officer I.  **See** Filing No. 42, Exhibit 2 - Houston Aff. ¶ 19.  For the shift bid, effective July 2003, the plaintiff requested B shift first, A shift second.  **See *id.***  Based on seniority only, the plaintiff would have been assigned to the B shift.  ***Id.***  However, giving each employee their first choice during the voluntary shift bidding process for the July 2003 bid would have resulted in a shortage below the minimum required number of female officers for the A shift and C shift.  **See *id.*** Exhibit 3 - Lee Aff. ¶ 11.  Therefore, the Department of Corrections elected to reassign officers based on an inverse seniority method pursuant to the Union Contract in order to meet the minimum female staffing needs.  ***Id.*** ¶ 12.

The plaintiff and eight other officers (four females and four males), were reassigned using the inverse seniority method.  ***Id.***  The five least senior female officers, including the plaintiff, on B shift were moved to the A or C shifts.  ***Id.*** ¶ 14; Exhibit 9.  The plaintiff was reassigned from her first choice shift, B shift, to her second choice shift, A shift.  ***Id.*** Exhibit 3 - Lee Aff. ¶ 13; Exhibit 9.  One of the female officers reassigned through the adjustment was moved from her second choice in shift, C shift, to her first choice in shift, A shift.  ***Id.*** Exhibit 3 - Lee Aff. ¶ 14; Exhibit 9.  The four least senior male officers on A shift were moved to the B or C shifts.  Like the plaintiff these male officers were reassigned from their first choice of shift to their second choice of shift.  ***Id.*** Exhibit 3 - Lee Aff. ¶ 13; Exhibit 9.

Three of the four males had greater seniority than the plaintiff. *Id.* Exhibit 3 - Lee Aff. ¶ 13. There were male officers on the B shift who had less seniority than the plaintiff. *Id.*; Exhibit 10 - Tipler Depo. 16-20.

The plaintiff prefers to work on the B shift because of her "home situation," she is a single mother of two children, and she trying to attend school in the evenings. *Id.* Exhibit 10 - Tipler Depo. 11-12, 30:21-25.  As a result of her shift transfer, the plaintiff had to work more overtime, leading to increased childcare costs and less time to spend with her children. *Id.* at 28:1-24, 30:5-25.  Also, the plaintiff suffered stress-induced headaches, which increased her medical costs. *Id.* at 28:11-16.  Finally, the plaintiff states she was deprived of training opportunities which, in turn, affected her ability to be promoted. *Id.* at 39:8 to 41:13.  Specifically, the plaintiff explained there are more activities going on during the day shift than on the night shift, which allows for more diverse training and experience in preparation for the test for promotion. *Id.*

The plaintiff worked on the A shift for three months. **See** Filing No. 42, Exhibit 10 - Tipler Depo. 18:15-25.  On September 19, 2003, she was informed she had the option of moving to the B shift. *Id.* Exhibit 2 - Houston Aff. ¶ 21, Exhibit 6.  The change was possible due to the hiring and training of additional female officers who had less seniority than the plaintiff. *Id.* Exhibit 2 - Houston Aff. ¶ 21.  The plaintiff accepted the offer for reassignment back to the B shift on or about October 1, 2003. *Id.* ¶ 22; Exhibit 7.  The plaintiff has received her first choice in shift assignment for each shift thereafter. *Id.* Exhibit 10 - Tipler Depo. 19:1-3.  The plaintiff was promoted on May 26, 2005, to Corrections Officer II. **See** Filing No. 42 Exhibit 10 at 6:5-7.

In October of 2003, the defendants sought further clarification of Jail Standard § 004.02A. **See** Filing No. 42, Exhibit 2 - Houston Aff. ¶14.  Specifically, the defendants asked the Jail Standards Board whether it was permissible to allow male officers to supervise, in any capacity, the female inmates. *Id.*  In response to this inquiry, the Jail Standards Board requested an opinion on the issue from the Nebraska Attorney General. *Id.*  The Attorney General Opinion, issued April 7, 2004, confirmed the Jail Standards Board's interpretation that, pursuant to Nebraska Revised Statute § 47-111, female inmates

6

may only be supervised by female officers.  *Id.*; Exhibit 1 -Macomber Aff. ¶ 9 and 10; Exhibit 5 - Attorney General Op. No. 04015.

## ANALYSIS

### A.   Standard of Review

Pursuant to the Federal Rules of Civil Procedure, summary judgment is appropriate when, viewing the facts and inferences in the light most favorable to the nonmoving party, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." **See** Fed. R. Civ. P. 56(c); ***McAllister v. Transamerica Occidental Life Ins. Co.***, 325 F.3d 997, 999 (8th Cir. 2003).  When making this determination, a court's function is not to make credibility determinations and weigh evidence, or to attempt to determine the truth of the matter; instead, a court must "determine whether there is a genuine issue for trial."  ***Anderson v. Liberty Lobby, Inc.***, 477 U.S. 242, 249 (1986); **see also *Johnson v. Crooks***, 326 F.3d 995 1007-08 (8th Cir. 2003).  "An issue of material fact is genuine if it has a real basis in the record."  ***Hartnagel v. Norman***, 953 F.2d 394, 395 (8th Cir. 1992) (**citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.***, 475 U.S. 574, 586-87 (1986)).  A court must "look to the substantive law to determine whether an element is essential to a case, and '[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.'"  ***Dulany v. Carhahan***, 132 F.3d 1234, 1237 (8th Cir. 1997) (**quoting *Anderson***, 477 U.S. at 248).

Summary judgment is proper when the plaintiff fails to demonstrate the existence of a factual dispute with regard to each essential element of his claim.  ***Bialas v. Greyhound Lines, Inc.***, 59 F.3d 759, 762 (8th Cir. 1995).  "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and [the rule] should be interpreted in a way that allows it to accomplish this purpose."  ***Celotex Corp. v. Catrett***, 477 U.S. 317, 323-24 (1986).  A party seeking summary judgment bears the responsibility of informing the court "of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, admissions on file, together with the affidavits, if any,' which it believes

7

demonstrate the absence of a genuine issue of material fact." ***Tenbarge v. Ames Taping Tool Sys., Inc.***, 128 F.3d 656, 657 (8th Cir. 1997) (**quoting *Celotex***, 477 U.S. at 325 (noting that the movant must show "there is an absence of evidence to support the nonmoving party's case.")).  Under this court's local rules:

> The moving party shall set forth in the brief in support of the motion for summary judgment a separate statement of material facts as to which the moving party contends there is no genuine issue to be tried and that entitle the moving party to judgment as a matter of law.

**See** NECivR 56.1(a)(1).

In the face of a properly-supported motion, "[t]he burden then shifts to the nonmoving party to 'set forth specific facts showing that there is a genuine issue for trial.'" ***Prudential Ins. Co. v. Hinkel***, 121 F.3d 364, 366 (8th Cir. 1997) (**quoting** Fed. R. Civ. P. 56(e)).  A nonmoving party may not rest upon the mere allegations or denials of its pleadings but, rather, must show specific facts, supported by affidavits or other proper evidence, showing that there is a genuine issue for trial.  **See** Fed. R. Civ. P. 56(e); ***Liberty Mut. Ins. Co. v. FAG Bearings Corp.***, 153 F.3d 919, 922 (8th Cir. 1998).  A nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party." ***Anderson***, 477 U.S. at 248.  Additionally, under this court's local rules:

> The party opposing a motion for summary judgment shall include in its brief a concise response to the moving party's statement of material facts. The response shall address each numbered paragraph in the movant's statement and, in the case of any disagreement, contain pinpoint references to affidavits, pleadings, discovery responses, deposition testimony (by page and line), or other materials upon which the opposing party relies. Properly referenced material facts in the movant's statement will be deemed admitted unless controverted by the opposing party's response.

**See** NECivR 56.1(b)(1).

**B.   42 U.S.C. § 1983**

8

In Claim I, the plaintiff alleges she was denied equal protection of the laws of the United States because of her gender when she was "bumped" from her preferred shift to the A shift.  The plaintiff's claim states:

> Defendants, acting under color of the law of the State of Nebraska, subjected Plaintiff to the deprivation of the following rights, privileges, and immunities secured by the Constitution and laws of the United States when Defendants failed to allow Plaintiff to remain on the "B" Shift she had been working and thus failed to accord Plaintiff her seniority rights.  Defendants deprived Plaintiff of her right to equal protection of the laws as guaranteed by the Fourteenth Amendment to the Constitution of the United States by intentionally basing the decision concerning failure to honor Plaintiff's seniority rights based solely on her sex.

**See** Filing No. 28, ¶ 13.

A government official may be liable upon a showing of deprivation of a constitutional or federal right.  42 U.S.C. § 1983.  To establish a section 1983 cause of action, the plaintiff must establish (1) she was deprived of a right "secured by the Constitution and laws" of the United States, and (2) the deprivation was caused by a person or persons acting under color of state law.  42 U.S.C. § 1983; *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978).  The Eighth Circuit has "held intentional gender discrimination in public employment by persons acting under color of state law violates the Equal Protection Clause of the Fourteenth Amendment and is actionable under section 1983."  *Ottman v. City of Independence, Mo.*, 341 F.3d 751, 756 (8th Cir. 2003) (**citing** *Marshall v. Kirkland*, 602 F.2d 1282, 1298 (8th Cir. 1979)).  To succeed on her claim, the plaintiff must establish intentional gender discrimination.  *Texas Dep't. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253-56 (1981).  The plaintiff does not allege the defendant Robert Houston was personally involved in the alleged violation (*Ottman*, 341 F.3d at 761), accordingly, the court will evaluate the claim as one against the governmental entity.

To impose liability under § 1983 on a county, a plaintiff "must show that his constitutional injury was caused by a policy or custom of the municipality, the implementation of which amounted to deliberate indifference to his constitutional rights."  *Lund v. Hennepin County*, 427 F.3d 1123, 1125 (8th Cir. 2005) (**citing** *City of Canton*

9

*v. Harris*, 489 U.S. 378, 388-91 (1989)).  This is because a local government cannot be held liable under § 1983 for an injury inflicted solely by its employees or agents on a theory of respondeat superior.  **See *Andrews v. Fowler***, 98 F.3d 1069, 1074 (8th Cir. 1996) (**citing *Monell v. Dep't of Social Servs. of New York***, 436 U.S. 658, 694 (1978)).

> The identification of an official policy as a basis upon which to impose liability ensures that a municipality is held liable only for constitutional deprivations "resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." Similarly, actions performed pursuant to a municipal "custom" not formally approved by an authorized decisionmaker "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law."

***Springdale Educ. Ass'n v. Springdale Sch. Dist.***, 133 F.3d 649, 651 (8th Cir. 1998) (**quoting *Board of County Comm'rs of Bryan County, Okl. v. Brown***, 520 U.S. 397, 402-03 (1997); **citing *McGautha v. Jackson County, Mo., Collections Dep't***, 36 F.3d 53, 55-56 (8th Cir. 1994)).

The plaintiff alleges she suffered a constitutional injury as the result of an official policy.  More specifically, the plaintiff alleges a violation of the Equal Protection Clause of the Fourteenth Amendment when the plaintiff was reassigned based on her gender pursuant to state law and the Jail Standards, rather than strictly based on seniority.  The defendants argue the gender-based job assignment policy bears a fair and substantial relationship to legitimate state ends.  Additionally, the defendants contend their failure to comply with the staffing policy would result in a violation of state law and the Jail Standards.

The plaintiff does not raise an issue with regard to the constitutionality of the Nebraska statute in question.  While the plaintiff argues the Jail Standards exemplify a misinterpretation of the Nebraska statute, the plaintiff did not bring this claim against the Jail Standards Board or the State of Nebraska.  The only claim alleged by the plaintiff is that the defendants - the County and the Director of Douglas County Corrections - intentionally discriminated against her on the basis of gender when they failed to honor her seniority rights.  However, there is no dispute the defendants complied with state law, the Jail Standards and the plaintiff's Union Contract in making the plaintiff's shift assignment.  Furthermore, the defendant treated both male and female officer the same when making

shift reassignments under the Union Contract, which provides a protocol for assigning a minimum number of female officers to each shift. Specifically in this case, four males and four females were reassigned from their first choice to their second choice shift in order to comply with minimum staffing requirements. The defendants acted reasonably when they reassigned the plaintiff in accordance with her Union Contract and pursuant to the Jail Standards and state law. Under these circumstances, the plaintiff has failed to allege a claim for an equal protection violation under § 1983.

However the court will evaluate the defendant's policy of reassigning female corrections officers to attain a minimum number of female officers on each shift to provide female-only staffing of the female inmate's housing unit, notwithstanding the Union Contract, state law and the Jail Standards. Accordingly, the court must consider whether the requirement of a minimum number of female officers' positions on each shift "serves any important governmental objectives and whether the discriminatory means employed are substantially related to the achievement of those objectives." **See, e.g.**, **Rucker v. City of Kettering**, Ohio, 84 F. Supp. 2d 917, 923 (S.D. Ohio 2000).

"[T]he Court has repeatedly recognized that neither federal nor state government acts compatibly with the equal protection principle when a law or official policy denies to women, simply because they are women, full citizenship stature-equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities." **United States v. Virginia**, 518 U.S. 515, 532 (1996). However, "[t]he equal protection guarantee of the Fourteenth Amendment does not take from the States all power of classification." **Personnel Adm'r of Mass. v. Feeney**, 442 U.S. 256, 271 (1979). "Classifications based upon gender, not unlike those based upon race, have traditionally been the touchstone for pervasive and often subtle discrimination. This Court's recent cases teach that such classifications must bear a close and substantial relationship to important governmental objectives and are in many settings unconstitutional." **Id.** at 273 (internal citations omitted). Parties who seek to defend gender-based government action must demonstrate an "exceedingly persuasive justification" for that action. **Virginia**, 518 U.S. at 531. Under the heightened scrutiny standard of **Virginia**, "the state must persuasively show that certain gender-based classifications serve 'important governmental

11

objectives' and that the statute in question is 'substantially related to the achievement of those objectives.'" **Ways v. City of Lincoln**, 331 F.3d 596, 600 (8th Cir. 2003) (**quoting Virginia**, 518 U.S. at 533). Further, "[t]he justification must be genuine, not hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." **Virginia**, 518 U.S. at 533.

The defendants argue their important governmental objective is compliance with state law and the Jail Standards. The defendants further contend they have no alternative but the gender-based assignment policy to stay in compliance with state law and the Jail Standards. To that end, the defendants contend the reassignment policy is based on Nebraska Revised Statute § 47-111 and Jail Standard 81, Chapter 2 § 002.02A, which recognize the differences in privacy and other rights and needs of female inmates from those of male inmates. Nebraska statutes specifically, authorize the Jail Standard Board to make rules on "matters as the board may deem necessary to promote the welfare of the prisoners." Neb. Rev. Stat. § 47-101. The sheriff, the person who has charge of the county jail, "shall conform to the rules and directions as prescribed by the Jail Standards Board." **Id.** §§ 47-105 and 47-105.01. The defendants, however, provide no evidence tending to show why only female officers should be allowed to supervise female inmates. The defendants cite to other Jail Standards which describe the duties of officers such as maintaining "around-the-clock" supervision of inmates by personally viewing each inmate at least once an hour for safekeeping. **See** 81 NAC 2 §§ 004.02A-B. Additionally, there are gender-related restrictions for strip searches, body cavity searches and pat searches. **Id.** NAC 6 § 006.01C. The defendants also rely on opinions of the Nebraska Attorney General interpreting the state law to preclude cross gender supervision of female inmates. **See** Filing No. 42, Exhibit 5.

While the defendant does not provide evidence for the court to determine the appropriate "minimum" number of female officers to provide adequate staffing coverage in the female inmates' housing unit and to complete other restricted tasks, the court need not make such determination. The defendants may rely on a presumptively valid statute unless "it is patently obvious that [such] conduct will oppressively harm another person" and they

12

act "with reckless disregard of the person's constitutional rights." **See *Guzman v. Western State Bank of Devils Lake***, 540 F.2d 948, 952 (8th Cir. 1976); **see also *United States v. Gregory***, 302 F.3d 805, 809 (8th Cir. 2002). Similarly, deference is given to professional judgment regarding prison policies and administration in weighing prisoners' privacy rights, guards' employment rights and the institutional need for internal security. **See *Timm v. Gunter***, 917 F.2d 1093 (8th Cir. 1990) (**citing *Turner v. Safley***, 482 U.S. 78, 88-91 (1987)); ***Tharp v. Iowa Dep't of Corr.***, 68 F.3d 223, 226 (8th Cir. 1995). In fact, "the reasoned decisions of prison officials are entitled to deference and that the goals of security, safety, privacy, and rehabilitation can justify gender-based assignments in female correctional facilities." ***Everson v. Michigan Dep't of Corr.***, 391 F.3d 737, 749-50 (6th Cir. 2004) (citing cases).

Here, the defendants relied upon the state statute and the Jail Standards promulgated by the Jail Standards Board who had the task of instituting standards based on the welfare of prisoners. Additionally, the defendants relied on the state statute and the Union Contract, which, negotiated by the union, would protect the interest of the employees. Additionally, the evidence shows the defendants have tried methods to accommodate the competing interests such as allowing male officers to cover female officers for short periods of time, however the practice was discontinued as unworkable. Accordingly, the court finds the defendants have a reasonable gender-based job assignment policy in reliance on state law, the Jail Standards and the Union Contract. Furthermore, the defendants' policy is substantially related to the achievement of the defendants' important government objective of maintaining county jails in conformance with applicable laws. Therefore, the defendants' motion for summary judgment on the plaintiff's claim brought pursuant to 42 U.S.C. § 1983 based on the Equal Protection Clause must be granted.

## C.    Title VII

The plaintiff alleges, in Claim II, the defendants discriminated against her because of her gender by denying her the ability to exercise her seniority rights as provided in the Union Contract. **See** Filing No. 28 ¶ 15. Similarly, the plaintiff alleges, in Claim III, the

13

defendants engaged in unlawful employment practices by failing to honor the plaintiff's seniority rights. *Id.* at ¶ 17. The defendants argue the plaintiff's claims under Title VII should be dismissed as a matter of law because the plaintiff has failed to allege an adverse employment action. In the alternative, the defendants assert the plaintiff's assignment was based on a bona fide occupational qualification.

### Adverse Employment Action

The defendants contend the plaintiff has failed to state a claim for relief under Title VII based on gender discrimination because she has failed to allege a prima facie case of discrimination. Specifically, the defendants argue the plaintiff failed to allege she suffered an adverse employment action when she was transferred from the B shift to the A shift. The defendants state the plaintiff underwent no materially significant employment disadvantage. The defendants contend the transfer was merely an inconvenience.

Pursuant to Title VII it is

> an unlawful employment practice for an employer–
> (1)   to . . . discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex . . .; or
> (2)   to limit, segregate, or classify his employees . . . in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's . . . sex. . . .

42 U.S.C. § 2000e-2(a).

When evaluating a gender-based job assignment policy, the Eighth Circuit employs a "Title VII balancing analysis" or "deferential balancing test." ***Tharp v. Iowa Dep't of Corr.***, 68 F.3d 223, 226 (8th Cir. 1995) (**citing** *Turner v. Safley*, 482 U.S. 78, 88-91 (1987); ***Johnson v. Transp. Agency***, 480 U.S. 616 (1987); and ***Timm v. Gunter***, 917 F.2d 1093 (8th Cir. 1990)). Under this test, the court must balance "a prison employer's reasonable gender-based job assignment policy" with the restriction on the plaintiff's employment. ***Tharp***, 68 F.3d at 226. The extent of the "restriction" on employment is whether the plaintiff suffered an adverse employment action. **See *id.***

14

Acts short of termination may constitute adverse employment actions, however, not everything that makes an employee unhappy is actionable. ***Montandon v. Farmland Indus., Inc.***, 116 F.3d 355, 359 (8th Cir. 1997). Loss of status and prestige alone do not rise to the level of an adverse employment action. ***Ledergerber v. Stangler***, 122 F.3d 1142, 1144 (8th Cir. 1997). To be actionable, the employment action must be "a material change in the terms or conditions of her employment." ***Id.*** A transfer or reassignment may rise to the level of an adverse employment condition if it is "a significant change in working conditions." ***Fisher v. Pharmacia & Upjohn***, 225 F.3d 915, 919 (8th Cir. 2000) (holding reassignment to less prestigious sales unit was an adverse employment action); ***Zotos v. Lindbergh Sch. Dist.***, 121 F.3d 356, 362 (8th Cir. 1997) (holding teacher's transfer from class for gifted students to regular classroom constituted an adverse employment action); **cf. *Harlston v. McDonnell Douglas Corp.***, 37 F.3d 379, 382 (8th Cir. 1994) (holding job transfer resulting in fewer secretarial duties and more stress was merely inconvenient, rather than an adverse employment action). However, "[i]t is well established that '[a] transfer involving only minor changes in working conditions and no reduction in pay or benefits will not constitute an adverse employment action.'" ***Spears v. Missouri Dep't of Corr. & Human Res.***, 210 F.3d 850, 853-54 (8th Cir. 2000) (alteration in original) (**quoting *Ledergerber***, 122 F.3d at 1144); ***Montandon***, 116 F.3d at 359 (transfer that required the plaintiff to move from one city to another was not actionable because the transfer did not entail a change in his salary, benefits, or any other aspect of his employment); **see also *Hoffman v. Rubin***, 193 F.3d 959, 964 (8th Cir. 1999) (transfer from St. Paul to Chicago not adverse employment action because rank, pay, and other benefits were unaltered). Typically, a change in shift assignment alters the conditions of an employee's job less than a transfer or other kind of reassignment.

Generally, a change in shift is not an adverse employment action. ***Mayes v. Potter***, 418 F. Supp. 2d 1235, 1242 n.7 (D. Colo. 2006); **see *Stutler v. Ill. Dep't of Corr.***, 263 F.3d 698, 702-03 (7th Cir. 2001) (no adverse action where lateral transfer without loss of benefits, although increased commute) (citing cases); ***Brown v. Brody***, 199 F.3d 446, 455-56 (D.C. Cir. 1999) (internal quotation marks and citations omitted) (citing many cases including those in Eighth Circuit); **see also *Jones v. District of Columbia Dep't of Corr.***,

15

429 F.3d 276, 280-81 (D.C. Cir. 2005) (routine shift change or routine reassignment cannot be deemed an adverse employment action); *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (change in work location that lengthened commute, and changed shift - varying shifts rather than one consistent shift not adverse employment action); *Grube v. Lau Indus. Inc.*, 257 F.3d 723, 728 (7th Cir. 2001) (altered work hours not adverse employment action where request to change from 1st to 2nd shift because of family situation denied); *Benningfield v. City of Houston*, 157 F.3d 369, 377 (5th Cir. 1998) ("Merely changing Benningfield's hours, without more, does not constitute an adverse employment action."). A change in shift schedule, for a short period of time, where the plaintiff continues to work in the same position, with the same job responsibilities and same pay without a loss in position or benefits does not constitute an adverse employment action.   *Freeman v. Federal Exp. Corp.*, No. 804CV2481, 2006 WL 563123 (M.D. Fla. Mar. 8, 2006) (shift change from a 5/8 schedule to a 4/10 schedule for three weeks) (**citing** *Gupta v. Florida Bd. of Regents*, 212 F.3d 571, 587-89 (11th Cir. 2000) (refusing desired work assignment, at desired hours and locations did not constitute an adverse employment action).  "The fact that [the plaintiff] did not like the new position is irrelevant when there is no evidence that the transfer decreased her responsibilities or benefits in any way."  *Stutler*, 263 F.3d 698, 702-03 (citation omitted).  However, a transfer to a less desirable position is an adverse employment action when it is equivalent to a demotion because it results in a decreased pay or eligibility for pay increases.  *Akins v. Fulton County, Ga.*, 420 F.3d 1293, 1301 (11th Cir. 2005).  Accordingly, the plaintiff must show "more than a mere lateral transfer; [the plaintiff] must present sufficient evidence that the transfer equated to a shift change that involves changes in duties or compensation or can objectively be characterized as a demotion."  *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 284 (5th Cir. 2004) (internal quotations and citation omitted).

In *Tharp*, male prison employees alleged discrimination in violation of Title VII when the prison adopted a policy of allowing only female employees to staff the women's unit of the prison, which encompassed four of sixteen shifts.  *Id.* at 224-26 (stating "[t]here is no question that [the defendant] implemented the policy to further legitimate penological and privacy concerns.").  The *Tharp* court noted the male plaintiffs admitted they suffered no

16

demotion, reduction in pay or termination. *Id.* at 226. Further, these plaintiffs' promotion opportunities were unaffected. *Id.* Finally, the **Tharp** plaintiffs failed to establish any right to particular shift assignments. *Id.* (noting, however, the plaintiff's claimed the collective bargaining agreement granted facility-wide seniority governing shift assignments). Based on these facts, the court concluded the plaintiffs were not harmed by such a minimal restriction on their employment, therefore the gender-based job assignment policy did not violate Title VII. Similarly, in **Timm**, the Eighth Circuit determined that a gender-based staffing restriction for the maximum security unit does not violate Title VII because the "minimal restriction" for that unit alone "does not deprive female employees of any employment opportunities." **Timm**, 917 F.2d at 1102 n.13 (also stating "[n]either is it a statutory violation to accommodate the privacy interests of the inmates and the need for internal security by excluding women from Unit 5 staff assignments.").

As the court determined above, the defendants have a reasonable gender-based job assignment policy. **See** discussion Section B *supra*. On the other side of the balance scale, the court must evaluate the restriction to the plaintiff's employment caused by the gender based assignment policy. The plaintiff fails to show she was entitled to any particular shift assignment. The Union Contract itself provides for shift bidding with assignments made pursuant to a classification seniority bidding process. **See** Filing No. 42, Exhibit 8 Art. IX, Sec. 2A. Under this process, the plaintiff may be subject to reassignment at any time during her employment. **See** *id.* Exhibit 10 at 41:21 to 43:3. Further, the Union Contract accounts for shift reassignment where "Nebraska State Law and Nebraska Jail Standards dictate the staffing of female officers." *Id.* Exhibit 8 Art. IX, Sec. 2A. Under the circumstances where such staffing requirements dictate alternate arrangements, both male and female officers may be assigned either the second or third shift preference, rather than the first preference. *Id.* Art. IX, Sec. 2. During the period when the plaintiff received her second shift preference, other officers, both male and female, were also assigned to their second shift preference due to the staffing policy and Union Contract assignment protocol.

Although the plaintiff admits she did not suffer a demotion, reduction in pay or termination, she states her promotional opportunities were affected because working on

17

her preferred shift would have provided her with experience necessary for promotional advancement and other special assignments.  Specifically, the plaintiff explained she did not have the opportunity for the same training experiences on the A shift:

> Once you go to a different shift, you're pretty much put back at the bottom as far as training. . . .
>
> In different positions, different areas as far as you have to be trained for the admissions area or the booking area, you have to be trained for the Central Control area.  The only thing I was trained was just to escort and work the housing units.  You have to start over at the bottom.  As far as seniority, they have their picks on who they put in certain areas.
>
> Once I went back to B shift, there were other things that opened up as far as like medical, Central Control where I was able to be trained in those different areas to work.
>
> A shift, a lot of that is not going on, there's pretty much no movement, you don't – you just don't – there's nothing there, they're all asleep, all the inmates are asleep, so you don't have anything – no movement, anything going on, you don't get to have that interaction like you do on B shift or C shift.
>
> C shift doesn't have as much as the B shift.  They don't have medical going on, you don't have the intake like on B shift when they come back from court.  They're going to court now, we have the courtroom.  I was able to do that training and work in the courtroom.  A shift you don't have that.

**See** Filing No. 42, Exhibit 10 at 39:8 to 40:23.

The plaintiff explained her ability to be promoted was "somewhat" affected by her lack of exposure to work-related experiences.  ***Id.*** at 40:24 to 41:1.  The plaintiff stated,

> You don't get that experience.  Some of those questions are on the test.  You don't get that experience.  You pretty much have to just read what's on the test.
>
> This time I was able to take the test.  I pretty much knew because I was able to work a lot of those areas, . . . A lot of that on A shift doesn't take place, so a lot of it you didn't know.  And it's kind of like you experience that more so than just reading it.

***Id.*** at 41:1 to 41:12.

The plaintiff fails to show the reassignment to a less preferred shift for three months and receiving less extensive work-related experience affected the timing of her promotion.

18

The plaintiff was promoted May 26, 2005, to a Corrections Officer II.  **See** Filing No. 42 Exhibit 10 at 6:5-7.  The plaintiff does not allege her failure to attain a broad range of work-related experience detrimentally altered her promotion opportunities. **See** Spears, 210 F.3d at 853-54; ***Enowbitang v. Seagate Tech. Inc.***, 148 F.3d 970, 973-74 (8th Cir. 1998) (failed to allege poor evaluation was a detriment to employment opportunities); ***Tharp***, 68 F.3d at 226 (no adverse employment action where promotion opportunities were unaffected).  The plaintiff fails to show any evidence she would have been promoted sooner had she not been reassigned or that those on a different shift were more likely to gain promotion.  **See** ***O'Neal v. City of Chicago***, 392 F.3d 909 (7th Cir. 2004) (failure to provide objective evidence that reassignment affected opportunities); ***Lewis v. City of Chicago Police Dep't***, No. 04C6050, 2006 WL 931727 (N.D. Ill. Apr. 06, 2006) (no showing failure to allow preferred assignment hindered the plaintiff's career).  Furthermore, a change in work-related assignments is not an adverse employment action without a showing that such change is material.  ***Duffy v. McPhillips***, 276 F.3d 988, 992 (8th Cir. 2002) (mere dissatisfaction with responsibilities insufficient without significant alteration of conditions of employment).  Accordingly, the plaintiff failed to show her change in employment significantly affected her future career prospects.

The plaintiff also alleges she was required to work more overtime shifts than she would otherwise have been assigned.  She does not allege the additional overtime was discriminatorily assigned, but that those on A shift work more overtime because there are fewer individuals on the shift.  Therefore, the overtime assignments occur more frequently than if a greater number of employees were assigned to the shift.  In any event, the requirement of working overtime is not an adverse employment action because the plaintiff was required to work overtime routinely as a part of her job duties, regardless of which shift assignment she had.  **See** Filing No. 42, Exhibit 10 at 29:3-10.  Accordingly, the change in frequency of the plaintiff's assignment to overtime shifts does not constitute an adverse employment action because it did not result in a material change to the conditions of her employment.  **See** ***Tatroe v. Cobb County, Georgia***, No. 1:04CV1074WSD, 2006 WL 559437, at *8 (N.D. Ga. Mar. 7, 2006) (the plaintiff's denial of opportunity to work the overtime shift of her choice where assigned shift was less convenient for her family's

child-care schedule insufficient to show and adverse employment action); **see also *Duffy***, 276 F.3d at 992; ***Jones***, 429 F.3d at 280-81 (routine reassignment cannot be deemed an adverse employment action).

Additionally, the plaintiff contends she suffered other harms to her life outside of work due to the shift reassignment.  The plaintiff was required to work more overtime hours than she previously had worked, resulting in less time to spend with her family or to pursue outside education.  She had to pay additional daycare expenses, which caused her to get behind on her bills and damaged her credit.  Finally, the plaintiff suffered headaches and increased medical expenses.  The hardship the plaintiff suffered outside the workplace as a result of the shift change, while unfortunate, does not convert her routine shift reassignment into an adverse action because such harms did not result in a material change to the conditions of her employment.  **See *Duffy***, 276 F.3d at 992; ***Thomas v. Potter***, 145 Fed. Appx. 182, 183-84 (7th Cir. 2005) (unpublished opinion) (finding no adverse action where shift change caused severe depression that necessitated medical treatment and counseling without material adversity to conditions of employment); ***Graham v. Fla. Dep't of Corr.***, 1 F. Supp. 2d 1445, 1450 (M.D. Fla. 1998) (finding employee's unsupported allegation that her reassignment caused "hardship on her and her family" insufficient to establish that reassignment was an adverse employment action under Title VII).

While it is clear the plaintiff's shift change was undesirable to her and inconvenient for her and her family, these complaints are not evidence that the shift change was a tangible change in working conditions that produced a material employment disadvantage.  Thus, the court finds the plaintiff's reassignment to the night shift does not constitute an adverse employment action.  Like the ***Tharp*** plaintiffs, the plaintiff here failed to establish any right to a particular shift assignment or that the assignment resulted in more than a

minimal restriction on her employment.[2]  Accordingly, the plaintiff's Title VII claims must be dismissed.  Upon consideration,

**IT IS ORDERED:**

1.      The defendants' Motion for Summary Judgment (Filing No. 40) is granted.

2.      This action and the plaintiff's Amended Complaint are dismissed with prejudice.

3.      Pursuant to Fed. R. Civ. P. 58, a separate judgment will be entered on this date in accordance with this Order.

DATED this 11th day of May, 2006.

BY THE COURT:

 s/Thomas D. Thalken
United States Magistrate Judge

---

[2]Because there was no more than a minimal restriction on the plaintiff's employment, the court need not determine whether the shift assignment is related to a bona fide occupational qualification.  **See Tharp**, 68 F.3d at 225 n.2; **see also Everson v. Michigan Dep't of Corr.**, 391 F.3d 737, 747 n.13 (6th Cir. 2004). However, such analysis conforms to the strictures of the Equal Protection Clause discussed **supra**.  **See Dothard v. Rawlinson**, 433 U.S. 321, 324 n.20 (1977).